UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

OMNIA STUDIOS, LLC,

Plaintiff,          Case # 23-CV-6186-FPG-CDH

v.                      DECISION AND ORDER

JD E-COMMERCE AMERICA LTD., et al.,

Defendants.

CINDY D. CHINN dba THE SAW LADY,

Plaintiff,          Case # 23-CV-6187-FPG-CDH

v.                      DECISION AND ORDER

JD E-COMMERCE AMERICA LTD., et al.,

Defendants.

COLLIS ECOMMERCE LTD,

Plaintiff,          Case # 23-CV-6188-FPG-CDH

v.                      DECISION AND ORDER

JD E-COMMERCE AMERICA LTD., et al.,

Defendants.

TURKEY MERCK, LTD.,

Plaintiff,          Case # 23-CV-6189-FPG-CDH

v.                      DECISION AND ORDER

JD E-COMMERCE AMERICA LTD., et al.,

Defendants.

## INTRODUCTION

Plaintiffs Omnia Studios, LLC., Cindy D. Chinn, Collis ECommerce Ltd., and Turkey Merck, Ltd. bring these related copyright and trademark actions against JD E-Commerce America Ltd. and Jingdong E-Commerce (Trade) Hong Kong Corp. ("JD"), Wal-Mart.com USA, LLC and Walmart Inc. ("Wal-Mart") (collectively, "Defendants").  ECF No. 1.[1]  The parties have filed multiple, dueling motions and cross-motions for partial or complete summary judgment.  ECF Nos. 56, 67, 109, 111, 123.  For the reasons that follow, Defendants' motions for summary judgment on all claims are GRANTED, and Plaintiffs' motions for summary judgment on all claims are DENIED.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor.  *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  However, parties "may not rely

---

[1] These actions involve a large number of filings spread across four dockets.  *See Omnia Studios LLC v. JD E-Commerce America Ltd., et al.*, No. 23-CV-6186 ("*Omnia*"); *Chinn v. JD E-Commerce America Ltd., et al.*, No. 23-CV-6187 ("*Chinn*"); *Collis Ecommerce Limited v. JD E-Commerce America Ltd., et al.*, No. 23-CV-6188 ("*Collis*"); *Turkey Merck Ltd. v. JD E-Commerce America Ltd., et al.*, No. 23-CV-6189 ("*Turkey*").  Although they acknowledged that "the circumstances of each plaintiff's claims are slightly different," the parties agreed to consolidate these actions because "the activity engaged in by the defendants is the same" and Plaintiffs and Defendants raise similar claims and defenses among the actions.  ECF No. 34 at 1-2.  Because the Plaintiffs allege substantially similar claims and the parties have consolidated most of their filings across the four dockets, the Court will principally cite to the filings in *Omnia* and will cite to the other dockets only as needed.  Accordingly, all ECF citations refer to filings in *Omnia* unless otherwise stated.

on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

## BACKGROUND

The following allegations are taken from the parties' filings in support of or opposition to the dueling motions for summary judgment. Because of the large number of filings in these actions, the Court limits its summation of the evidence to the documents directly relevant to the following issues: (1) the alleged infringements themselves; (2) the relationship Defendants had to the sale of infringing products and whether they are classified as internet service providers ("ISPs") for the purposes of liability and immunity; and (3) the Defendants' enforcement of anti-infringement policies.

### I.    The Alleged Infringements

Plaintiffs are a variety of businesses that, as relevant here, sell products online through their own websites or through platforms like Walmart.com.[2] ECF No. 111-5 ¶ 4. Utilizing an intellectual property ("IP") agent service, QTI.AI, Plaintiffs each discovered alleged infringements of their IP being sold on Walmart.com by sellers using the labels JOYBUY, JOYBUY EXPRESS, JOYBUY SELECTION, JOYBUY FASHION, JOYBUY U.S.[3] (collectively "Joybuy"). ECF No. 56-43 ¶ 6. QTI.AI made test purchases of the allegedly infringing products and had them shipped to Corning, New York; upon receipt, QTI.AI discovered that the products were counterfeits.[4] ECF No. 56-43 ¶¶ 8-10. QTI.AI's investigation

---

[2] Omnia is a jewelry studio which sells "bewitchingly surreal handmade jewelry." ECF No. 111-5 ¶ 4. Chinn creates wood carvings, among which are "plasma lasered handsaws, into which she laser cuts detailed carvings." *Chinn*, Dkt. No. 118-5 at ¶ 4-5. Collis is a marketing agency that also sells a backyard golf chipping game, the "Battle Royale Golf Game." *Collis*, Dkt. No. 110-5 ¶¶ 4-8. Turkey designs and sells handmade mugs. *Turkey*, Dkt. No. 106-5 ¶ 5.

[3] Plaintiffs refer to "JOYBUY AMERICA" as one of the Joybuy labels. ECF No. 111-5 ¶ 21. Because the parties consistently state there was only five Joybuy labels and JOYBUY U.S. is more commonly referred to by parties, the Court assumes that JOYBUY AMERICA is merely an alternative name for JOYBUY U.S.

[4] Plaintiffs provide photos of the delivered counterfeits and their packaging. *See* ECF No. 56-46; *Chinn*, Dkt. No. 58-45; *Collis*, Dkt. No. 59-45; *Turkey*, Dkt. No. 55-45. In his declaration, the QTI.AI agent that purchased the counterfeits states for each counterfeit product that "the return address and method of shipping indicated that the item was

revealed multiple separate listings by Joybuy on Walmart.com offering to sell infringing products from each Plaintiff, spread out over a period of several months.[5]  The parties agree that Joybuy is in some way connected to JD, but disagree as to the nature of that relationship, as will be discussed below.  ECF No. 143-1 ¶ 1.

## II.    Defendants' Relationship to the Alleged Infringements

### a.  Wal-Mart

It is undisputed by the parties that Wal-Mart is "service provider of network communication services, online services, or network access" and that Wal-Mart designated an agent to address notifications of alleged infringement happening on Wal-Mart's internet marketplace.  ECF No. 121-3 ¶¶ 1-3.[6]  The parties also do not dispute that Wal-Mart "provided internet marketplace services to product merchants, who uploaded allegedly infringing content and sold allegedly infringing product on Wal-Mart.com."  ECF No. 135-1 ¶ 3.  Wal-Mart's status as an ISP is therefore not in dispute in this matter—rather, the parties save their sharpest disagreements for whether Wal-Mart reasonably enforced its anti-infringement policies. *See, e.g.,* ECF No. 135 at 16-17.

### b.  JD

The parties dispute JD's role in the operation of Joybuy and the alleged infringements.  Plaintiff asserts that JD directly sold products on Walmart.com via the Joybuy labels, which would render JD liable

---

warehoused and shipped [] within the United States," without elaboration.   ECF No. 56-43 ¶ 8.  Of the provided photos, however, only those in *Chinn* and *Collis* show a shipping address, listed as Franklin Park, Illinois.  *Chinn*, Dkt. No. 58-45 at 3; *Collis*, Dkt. No. 59-45 at 2.  The photos in *Omnia* and *Turkey* show only a QR code and identification numbers, the significance of which Plaintiffs do not explain.  *See, e.g.,* ECF No. 56-46 at 2.  JD's legal counsel provided a declaration in which he attests that the Franklin Park address is not associated with JD and that JD did not ship, warehouse, or deliver the counterfeits.  ECF No. 67-3 ¶ 8.

[5] Plaintiffs provided QTI.AI's compiled lists of infringements, which show that total number of listings and the periods in which they were discovered were: 104 for Omnia between December 2022 and March 2023, ECF No. 111-9 ¶ 5; 91 for Chinn between July 2022 and April 2023, *Chinn*, Dkt. No. 118-8 ¶ 5; 30 for Collis between December 2022 and March 2023, *Collis*, Dkt. No. 110-10 ¶ 8; and 69 for Turkey between September 2022 and June 2023, *Turkey*, Dkt. No. 106-8 ¶ 9.

[6] Wal-Mart points out that Plaintiffs assert "relatively small levels of infringing sales—Chinn ($311.40), Collis ($2,195.28), Omnia ($170.01) and Turkey ($153.66)."  ECF No. 121-3 ¶ 16.  Plaintiffs dispute whether these constitute "relatively small levels."  *Id.*

for infringing listings by Joybuy on Walmart.com. ECF No. 135 at 18. In support of this argument, Plaintiffs provide the Wal-Mart retailer agreement which governs the relationship between JD and Wal-Mart, as well as amendments and other policies incorporated into the agreement. *See, e.g,* ECF Nos. 56-9.[7] As relevant here, the agreement provides the policies to which a party must agree before they are permitted to operate on Walmart.com, including: (1) to not sell infringing products, ECF No. 56-9 at 2-3; (2) to remove infringing listings, including those by sub-sellers, ECF Nos. 56-9 at 2-3, 56-31 at 1; (3) that items sold must be returnable to Wal-Mart stores, ECF No. 56-13 at 1; (4) to conform to Wal-Mart seller performance standards, including delivery rates, ECF No. 56-9 at 1; (5) to comply with federal and state laws applicable to products advertised or sold, ECF No. 56-21 at 1; (6) to ship products to Wal-Mart facilities if Wal-Mart's fulfillment services are used for delivery, ECF No. 56-28 at 2-3. Notably, the agreement states that:

> This Agreement applies to any entity ("Retailer" or "you") that wants to sell goods or services ("Products") in the Walmart.com Marketplace through the Walmart.com site or any Walmart applications ("Walmart.com Sites"), use any order processing, fulfillment, shipping, returns, or other services related to the Walmart.com Marketplace provided by or for Walmart, including, but not limited to Walmart AdCenter [] ("Walmart.com Services"), or use any platform, portal, web service, application, interface, or other tool provided by or for Walmart.com in connection with the Walmart.com Marketplace [].

ECF No. 56-9 at 2 (parentheticals in original). Finally, Plaintiffs provide screenshots of infringing listings. ECF No. 56-44. Each of the listings state that the products were "[s]old and shipped" by one of the Joybuy labels. *See, e.g., id.* at 6.

By contrast, Defendants assert that JD did not directly sell the infringing products nor create the infringing listings—rather, JD is merely an intermediary that operates Joybuy as a "marketplace" through which third-party sellers may create listings of their own. ECF No. 67-1 at 3-4. Defendants rely primarily on the declarations of Elizabeth Snukset, Wal-Mart's Senior Director for E-Commerce Compliance, and Qiaotian Han, legal counsel for JD. *See* ECF Nos. 67-3, 77, 109-3.

---

[7] Per the testimony of Iris Kwok, a JD executive in charge of the company's relationship with Wal-Mart, it is undisputed that JD agreed to abide by the policies of the retailer agreement when it applied to use the Wal-Mart online marketplace. ECF No. 56-10 at 2.

According to Snukset, Joybuy is an example of a "marketplace-to-marketplace model" not uncommon on Walmart.com, in which "operators of foreign internet marketplaces . . . contract with an internet marketplace in the United States" to use the domestic internet marketplace for sales. ECF No. 109-3 ¶ 12. Snukset and Han both report that JD was not the originator of the infringing products, but merely operated the Joybuy online marketplaces on which the products were listed. *See* ECF Nos. 67-3 ¶ 6 (through "a separate Chinese-language website that is hosted in China . . . JD [] provided an online platform that allowed third-party sellers from China to sell products on Walmart.com, but [] JD did not (and do not) themselves sell products through Walmart.com"); ECF No. 109-3 ¶ 20 ("JD Defendants were not the actual source of the merchandise sold on the Joybuy Marketplaces at Walmart.com or the content creators of listings . . . . Rather, the JD Defendants operated the Joybuy Marketplaces on Walmart.com" and the infringing listings were "uploaded by sub-sellers"). Therefore, according to Han, JD was not "an actual *seller* of product, but instead a *platform* within Walmart.com for third-party sellers to sell products," and it was third-party sellers—not JD—that had control over publishing the infringing listings and all arrangements for the sale and delivering of the infringing products. ECF No. 67-3 ¶¶ 7-8 (emphasis in original). Moreover, JD did not ship or deliver any infringing products.[8] *Id.* ¶ 2.

Addressing the listings which state that Joybuy sold and shipped the infringing products, *see* ECF No. 56-44 at 6, Han attests that "the language 'sold and shipped by' results from Walmart.com's template for online listings," and that in spite of this JD "did not have control over how Walmart.com identifies the seller and shipper of the product on such listings," ECF No. 67-3 ¶ 7.[9] As a counterexample, Han provides

---

[8] Han describes the system of listing and selling on the Joybuy marketplaces on Walmart.com thusly. A third-party seller lists the product. ECF No. 67-3 ¶ 9. After a consumer places an order, the seller ships the product, "often from China, making its own choice of a logistics service" of the seller's choice. *Id.* The logistics service might be, but is not necessarily, one affiliated with Wal-Mart—the seller is free to rely on third-party logistics services. *Id.* It is possible that the seller might utilize a logistics service affiliated with JD's parent company, but said logistics service is "not owned, operated, managed, or controlled" by the JD Defendants in this action. *Id.* JD "facilitate[s] communications between third-party sellers and consumers," but is uninvolved in the supply chain. *Id.* ¶¶ 9-10.

[9] This dispute is further illustrated by the testimony of Kwok, who—in response to questions as to whether JD were "retailers" on Walmart.com per the retailer agreement—attested that JD were instead "account owners" that facilitated for third-party sellers. ECF No. 56-10 at 11. Kwok stated that the language referring to JD as a "retailer" in the agreement was due to it being a "generic agreement." *Id.*

a copy of an "About Seller" page on Walmart.com which states that Joybuy is an "English online marketplace platform" that facilitates sales of products "listed, offered, and sold by independent sellers on the Joybuy Marketplace." *Id.* at 13.[10]  As to the Wal-Mart retailer agreement, Han states that although the agreement refers to obligations concerning sales, shipping, and returns, these functions could be and were performed by third-party sellers. *Id.* ¶ 8.  For example, the agreement requires that parties involved in sales set up a return center with a U.S. address, "but this was done by the third-party sellers," not JD.  *Id.*

### III.   Defendants' Policies and Actions Towards Infringing Products

#### a.  Wal-Mart

It is undisputed that Wal-Mart has a policy that demands the removal of infringing listings; that Wal-Mart maintains a "repeat infringer policy" that allows for suspending or terminating sellers that repeatedly infringe; that Wal-Mart determines who is considered a repeat infringer; and that these policies were promulgated to users.  ECF No. 121-3 ¶¶ 5-7.  It is further undisputed that action pursuant to the repeat infringer policy was based on whether (1) the infringing party had prior notice of the IP; (2) the party had taken steps to comply with Wal-Mart's infringement policy; (3) the number of infringement complaints, "including relative to the number of sales"; and (4) a claimed infringement has reoccurred.  *Id.* ¶ 8.

Beyond this, the parties disagree as to whether Wal-Mart's efforts in combating the alleged infringements were sufficient.  Plaintiffs argue that they were not, relying in part on the declarations of William L. Boychuck, the QTI.AI agent that conducted Plaintiff's infringement investigation, which states as follows.  ECF Nos. 56-43; 111-9; 121-7.  Wal-Mart failed to enforce repeat infringer policy against JD, despite Plaintiffs having reported multiple infringing listings.  ECF No. 121-7 ¶¶ 10-12.  Whenever QTI.AI submitted a notice to Wal-Mart about infringing listings, "Wal-Mart responded with a ticket ID acknowledging receipt of the infringement report," demonstrating that Wal-Mart was on notice about the

---

[10] According to Han, JD's operation of Joybuy marketplaces on Walmart.com terminated on May 31, 2024.  ECF No. 77 ¶ 4.

repeated infringements and yet did not suspend or terminate JD. *Id*. ¶ 13.[11]  In addition, Plaintiffs provide an attorney declaration summarizing the deposition of Samuel Collis, a designated Rule 30(b)(6) witness.[12] ECF No. 121-4.  Collis stated that his company repeatedly notified Wal-Mart of infringing listings, but any taken-down listings were soon replaced by new ones.  *Id*. ¶ 7.  Collis acknowledged that infringing listings were typically removed "the same day or shortly after," and that duplicative infringing listings were "[q]uite possibly" taken down again by Wal-Mart.  *Id*. ¶ 8.

Defendants responds with the Snukset's declaration.   Snukset states that Wal-Mart did not discontinue business with JD on account of the infringing products because there was no evidence that JD planned to relist or sell infringing products by sub-sellers and, to the contrary, Wal-Mart had seen a relatively low number of infringement complaints concerning JD compared to its business volume or the rates of other merchants.  ECF No. 109-3 ¶ 22.  Further, Snukset alleges that Defendants acted promptly to remove the infringing listings, providing business records that shows each infringement complaint filed and the amount of time elapsed before the listing was taken down.  *Id*. ¶ 15.  The records reflect that Defendants took down most of the infringing listings within one or two days after the complaint, or within at most two weeks.  *Id*. at 14-21.  The only exceptions were ten items which took several months to a year to resolve, which Snukset attributes to a "technical glitch or system error" which prevented automatic delisting and required Wal-Mart to manually remove the listings after having discovered they were still active.  *Id*. at 8 n. 3.  Snukset stresses that Wal-Mart "received no financial benefit directly" from the infringing products and instead "acted in its traditional capacity as a passive marketplace" that received only referral fees for providing a platform for users.  *Id*. ¶ 18.

### b.  JD

---

[11] Boychuck briefly alludes to evidence of repeat infringements of IP owned by Chinn, Omnia, and Collis by other Walmart.com sellers unrelated to JD.  ECF No. 121-7 ¶ 10.  The Court agrees with Defendants that the actions of unrelated sellers are not relevant to the matter at hand, and so will not rely upon this evidence.

[12] The transcripts of this deposition, and ones of Boychuck and Kevin Merck (of Turkey Merck), are not available because "a court reporter, arranged by Defendants' deposition vendor . . . remains unresponsive despite extensive contact attempts."  ECF No. 94 ¶ 2.  Because of this, the parties instead rely on declarations of attorneys present during the depositions and the notes taken by them.

Because Plaintiffs assert that JD itself sold the infringing goods, they likewise argue that Plaintiffs failed to take reasonable action to curtail infringement. Boychuck attests that QTI.AI notified Defendants of the Plaintiffs' IP rights and the infringements, but did not "detect any change in JD Defendants' continued ability to commit infringement on Walmart.com or a change in Walmart's policies permitting JD Defendants to infringe." ECF No. 111-9 ¶ 9. He further points to the repeated infringing listings via Joybuy as proof that JD failed to reasonably combat infringement. *Id.* ¶ 13.

As noted above, Defendants claim that JD was a mere platform for third-party sellers and was therefore not responsible for the creation of infringing listings. Defendants claim that they are unaware of any evidence that JD had knowledge of any infringement arising from listings via Joybuy prior to notification by either outside IP agents or JD's own takedown system. *See* ECF No. 109-3 ¶ 20. When JD was notified of infringing listings from sellers, they "promptly took the allegedly infringing listing down without adjudicating the merits." ECF No. 67-3 ¶ 10. JD relied upon a "keyword screening system" that located listings that were closely similar to previous infringers and then allowed JD to either take down or block them. *Id.* ¶ 11. This system, though "not perfect," was "generally effective at preventing most recurring listings of allegedly infringing items." *Id.*

## IV.    Procedural History

In March 2023, Plaintiff filed the actions. ECF No. 1. Plaintiffs make the following claims in their respective actions against all Defendants, unless stated otherwise. Omnia claim (1) copyright infringement; and (2) contributory copyright infringement against Wal-Mart. ECF No. 1 ¶¶ 99-124. Chinn claims (1) trademark infringement pursuant to 15 U.S.C. § 1114 (the "Lanham Act"); (2) false designation of origin pursuant to 15 U.S.C. § 1125(a); (3) common law unfair competition; (4) common law trademark infringement; (5) contributory trademark infringement against Wal-Mart. *Chinn*, Dkt. No. 1 ¶¶ 119-161. Collis makes the following claims: (1) false designation of origin pursuant to Section 1125(a); (2) common law unfair competition; (3) common law trademark infringement; (4) copyright infringement; (5) contributory trademark and copyright infringement against Wal-Mart. *Collis*, Dkt. No. 4 ¶¶ 122-185.

Finally, Turkey claims: (1) copyright infringement; and (2) contributory copyright infringement against Wal-Mart.[13]  *Turkey*, Dkt. No. 1 ¶¶ 120-191.

The present motions were filed across all four actions and were accompanied by appropriate opposition and reply briefs.[14]  In September 2024, Wal-Mart moved for summary judgment on all claims, arguing that Wal-Mart had immunity under the safe harbor provisions of the DMCA (for copyright claims) and that there were no genuine disputes of material fact as to the trademark claims, or alternatively for partial summary judgment with regards to willful infringement.  ECF No. 109.  Plaintiffs simultaneously

---

[13] Turkey brought additional claims for (1) trademark infringement pursuant to Section 1114; (2) false designation of origin pursuant to Section 1125(a); (3) common law unfair competition; (4) common law trademark infringement; and (5) contributory trademark infringement.  *Turkey*, Dkt. No. 1 ¶¶ 120-191.  However, Turkey states that it is "proceeding only on its copyright claims."  *Id.*, Dkt. No. 106-2 at 6.  Accordingly, the Court will not address the non-copyright claims with respect to Turkey and these claims are dismissed with prejudice.

[14] The parties additionally filed dueling motions for partial summary judgment on the issue of personal jurisdiction as to JD.  ECF Nos. 55, 67.  These motions remain pending, but the Court has strong reasons to believe that the record as to personal jurisdiction is not properly developed.  Among other filings, JD provided a supplemental declaration by Han in which, as relevant here, he attests that recent investigations had revealed that JD had far more contacts with New York than he had previously reported.  ECF No. 84-2.  The parties have not addressed this new evidence, despite its relevance and their extensive prior briefing on personal jurisdiction.  Moreover, Plaintiffs now move to reopen the record to submit deposition testimony by Snukset, which purportedly contains information vital to the personal jurisdiction question.  ECF No. 85.  Given these issues, the evidentiary basis for a ruling on personal jurisdiction is lacking.  *See McDonough v. Cycling Sports Grp., Inc.*, 392 F. Supp. 3d 320, 329 (W.D.N.Y. 2019) ("It is axiomatic that the Court cannot assess the reasonableness of an exercise of jurisdiction under the particular circumstances of a matter where, as here, the precise details of those circumstances are unclear.").

Typically, where a party requests summary judgment on personal jurisdiction grounds and their factual allegations are contested, the court is required to hold a hearing, at which the plaintiff must prove the existence of jurisdiction by preponderance of the evidence.  *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).  Although a hearing may clarify the factual discrepancies in the record, it would also require yet more briefing by the parties and further delays in deciding this matter.  The Court further notes that the issue of personal jurisdiction is likely to be a thorny one: other courts have addressed whether they had personal jurisdiction over JD in similar copyright and trademark cases but offer no consensus on the matter.  *See, e.g., Dan Wang v. The Partnerships and Unincorporated Associations Identified on Schedule A*, No. 22-CV-3201, Dkt. No. 92 (N.D. Ill. Dec. 8, 2023) (granting JD's motion to dismiss for lack of personal jurisdiction); *Royal Enamel Ltd. v. JD E-Com. Am. Ltd.*, No. 22-CV-23990, 2024 WL 5074976 (S.D. Fla. Dec. 11, 2024) (concluding that the court had personal jurisdiction over JD).

Rather than delve into this issue further, the Court will assume that personal jurisdiction exists for the purpose of determining the motions for summary judgment as to the merits.  Because the Court grants summary judgment for Defendants on the merits, the motions for partial summary judgment and to reopen the record are DENIED AS MOOT.  The Court notes that, although determinations of personal jurisdiction and liability as to JD may rely on similar evidence concerning JD's disputed role as a seller on Walmart.com, a determination that JD was not liable does not necessarily mean JD could not be subject to the Court's personal jurisdiction.  *See Lee v. Insomnia Cookies LLC*, No. 23-CV-6321, 2024 WL 1055639, at *5 (W.D.N.Y. Mar. 11, 2024) (holding that liability has "no bearing on personal jurisdiction because, as a general matter, liability and jurisdiction are two different inquiries").

moved for summary judgment on all claims. ECF No. 111. In November 2024, JD and Wal-Mart filed a joint consolidated motion for summary judgment on all claims, arguing that Defendants were entitled to immunity under the DMCA and there was no dispute of material fact as to Plaintiff's claims. ECF No. 123.

## DISCUSSION

Although the parties provides numerous claims and arguments, the Court has found two dispositive issues: Defendants' entitlement to immunity under the DMCA and the merits of the trademark claims.[15] As such, these claims are addressed below.

### I.    Copyright Infringement and DMCA Immunity

To establish copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The issue the Court faces here concerns the "safe harbor immunity" provisions of the DMCA, which shields ISPs from liability under certain circumstances. *See* 17 U.S.C. §§ 512(a)-(d).

"To qualify for the safe harbor provisions under the DMCA, a party must meet certain threshold requirements, including that the party (1) must be a service provider [ISP] as defined by the statute; (2) must have adopted and reasonably implemented a policy for the termination in appropriate circumstances of users who are repeat infringers; and (3) must not interfere with standard technical measures used by copyright owners to identify or protect copyrighted works." *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 743 (S.D.N.Y. 2012), *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014).

The DMCA includes two definitions of the term "service provider:"

---

[15] The parties further argued as to whether Plaintiffs possessed valid trademarks or if Defendants were liable for direct copyright infringement. *See, e.g.,* ECF No. 135 at 7-13. Because Defendants' entitlement to immunity would warrant dismissal of all claims, the Court assumes that the requirements for copyright and trademark infringement claims were met to the extent necessary to consider the immunity arguments.

(A) As used in subsection (a), the term 'service provider' means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.

(B) As used in this section, other than in subsection (a), the term 'service provider' means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A).

17 U.S.C. § 512(k)(1).  "The DMCA's definition of 'service provider' is intended to encompass a broad set of Internet entities." *Wolk*, 840 F. Supp. 2d at 744.

The safe harbor provision at issue here is Section 512(c), which states that ISPs can avoid liability for copyright infringement that occurs "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c)(1).  As relevant here, Section 512(c) provides safe harbor immunity only where the ISP:

(A) (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement . . ., responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

*Id*.

### a.  JD

Plaintiffs raise only one argument as to why JD is not entitled to safe harbor immunity: that JD is not a "service provider" for the purposes of the DMCA.  ECF No. 135 at 17-19.  Plaintiffs argue that JD was rather a direct seller, who themselves shipped and sold the infringing products and used Wal-Mart "as

their agent to do business in New York." *Id.* at 18. In support of this, Plaintiffs rely on the Wal-Mart retailer agreement that JD signed, which provides multiple policy requirements concerning sales, shipping, and delivery, *see, e.g.,* ECF No. 56-9, and screenshots of the infringing listings that state the products were sold and shipped by Joybuy. ECF No. 56-44 at 6.

The Court is not convinced that Plaintiffs or the evidence they rely on raise a genuine issue of material fact as to JD's entitlement to safe harbor immunity. First, regarding the retailer agreement, Han attests that although the agreement contains provisions governing sales and shipping, that did not necessarily mean that JD was the one performing those functions. ECF No. 67-3 ¶ 8. Rather, the selling and delivering of products were done by third-party sellers. *Id.* Snukset echoes this, stating that JD was not the source of merchandise sold via Joybuy and that sales were instead done by sub-sellers. ECF No. 109-3 ¶ 20.

Plaintiffs do not provide an effective counter to these sworn statements, instead arguing that Han and Snukset's declarations are conclusory and therefore should not be relied upon. ECF Nos. 121 at 9-15, 135 at 18-19. The Court cannot agree. These declarations provide ample detail as to JD's role as a platform within Walmart.com, how JD functioned, and what part it played in the sales and supply chain. Snukset attests, based on her own expertise and personal knowledge, that "marketplace-to-marketplace" models like that of JD are not uncommon on Walmart.com. ECF No. 109-3 ¶ 12. Han provides extensive explanations as to JD's operations and how those operations demonstrate its status as a service provider. ECF No. 67-3 ¶ 9. These declarations and the statements therein go well beyond what the Court would consider conclusory. *See Scott v. Coughlin,* 344 F.3d 282, 289 (2d Cir. 2003) ("These sworn statements are more than mere conclusory allegations subject to disregard; they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion."). In the absence of any convincing authority or contradictory evidence from Plaintiff, the Court cannot see a genuine dispute of material fact.

Plaintiffs' remaining arguments do not change this conclusion. The listings Plaintiff provides may state briefly that Joybuy is responsible for arranging delivery, but further investigation on the listings leads

to the About Seller pages provided by Defendants, which state explicitly that Joybuy was a marketplace platform that facilitated sales and shipping done by independent third-parties.  ECF No. 67-3 at 13.  As to Plaintiffs' argument that JD had an agency relationship with Wal-Mart, this is not reflected in any of the evidence provided to the Court and contradicts the explicit terms of the Wal-Mart retailer agreement, which states that JD would "act[] as independent contractors" and that "[n]o agency . . . is intended or created by this Agreement."  ECF No. 56-9 at 13.  This language is sufficient to dispel Plaintiffs' claim of an JD or Wal-Mart acting as agents.  *See BWP Media USA, Inc. v. Clarity Digital Grp., LLC*, 820 F.3d 1175, 1180 (10th Cir. 2016) (holding that a contract explicitly designating party as an independent contractor and disclaiming any agent status was sufficient to show that the party was not an agent for DMCA immunity purposes).

In sum, the Court finds no dispute of material fact as to JD's status as a service provider and, therefore, its entitlement to DMCA immunity.

**b.  Wal-Mart**

**i.  Section 512(c)(1)(B)**

Plaintiffs argue that Wal-Mart received financial benefits from the infringing sales and is therefore disqualified from safe harbor immunity.  The Court disagrees.

Section 512(c)(1)(B) "provides that an eligible service provider must not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity."  *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 36 (2d Cir. 2012) (internal quotation marks omitted).  The Second Circuit has explained that the "right and ability to control" must entail "something more than the ability to remove or block access to materials posted on a service provider's website."  *Viacom*, 676 F.3d at 38. The alternative would mean that the ability to remove or block access, a "prerequisite to safe harbor protection under § 512(c)(1)(A)(iii) & (C)," would also be "a disqualifier under § 512(c)(1)(B)."  *Id*. at 37.  "Instead,

possession of the right and ability to control contemplates circumstances in which a service provider exert[s] substantial influence on the activities of users." *Downs v. Oath Inc.*, 385 F. Supp. 3d 298, 308 (S.D.N.Y. 2019) (internal quotation marks omitted); *see also Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 613 (9th Cir. 2018) ("To have the right and ability to control, a service provider must be able to exert 'substantial influence' on its users' activities.").

Even assuming that Wal-Mart received a financial benefit that could be directly attributed to the infringements, Plaintiff has not shown that Wal-Mart had the right and ability to control that behavior. It has not been substantially disputed by the parties that, aside from permitting sellers to use Walmart.com and removing infringing products, Wal-Mart exercised little influence over the activities of its users. As the operator of the marketplace, Wal-Mart allowed users to take the lead on creating listings and thereby selling products—including infringing ones. Wal-Mart's ability to remove infringing content does not grant it the right and ability to control, nor does its role in screening content as it was listed. *See Downs*, 385 F. Supp. 3d at 308 (holding that ISP having "engaged in cursory screening" of user-uploaded content was insufficient to show right and ability to control). Accordingly, Plaintiffs have failed to create a genuine dispute of material fact as to this point.

### ii.     Section 512(c)(1)(A)(ii)

Plaintiffs claim that, despite having been notified of infringing products, Wal-Mart remained willfully blind as to the activities of infringing sellers. ECF No. 121 at 19-21.

In order to be disqualified for immunity due to failure to become aware of apparent infringing activity under Section 512(c)(1)(A)(ii), "the service provider must have actually known facts that would make the specific infringement claimed objectively obvious to a reasonable person" who is "not endowed with specialized knowledge or expertise" concerning copyright law.

*Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 93 (2d Cir. 2016).  "A service provider is not . . . permitted willful blindness.  When it has reason to suspect that users of its service are infringing a protected mark, it may not shield itself from learning of the particular infringing transactions by looking the other way." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 109 (2nd Cir. 2010).  Willful blindness can "demonstrate knowledge or awareness of specific instances of infringement under the DMCA." *Viacom*, 676 F.3d at 35; *see also EMI Christian Music Grp.*, 844 F.3d at 92 (analyzing willful blindness of infringement in the context of Section 512(c)(1)(A)(ii)).  "[W]hile statutory immunity is an affirmative defense, the burden falls on the copyright owner to demonstrate that the service provider acquired knowledge of the infringement, or of facts and circumstances from which infringing activity was obvious, and failed to promptly take down the infringing matter, thus forfeiting its right to the safe harbor." *Downs*, 385 F. Supp. 3d at 305 (internal quotation marks omitted).

The Court finds that Plaintiffs have failed to create a genuine issue of material fact as to Section 512(c)(1)(A)(ii) and willful blindness.  Even assuming that Wal-Mart had the requisite knowledge, Plaintiff has failed to show that Wal-Mart did not promptly take down infringing products.  Records filed by Defendants show that Wal-Mart took most of the infringing listings within a day of receiving a complaint.  ECF No. 109-3 ¶ 22.  Collis's testimony affirmed the same.  ECF No. 121-4 ¶ 8.  Plaintiffs point to only a small number of listings that remained active for longer periods of time, but this seems to speak more to the technical difficulties involved in curating an online marketplace than a sign of willful blindness.  As reported by Snukset, these lapses are attributable to glitches within Wal-Mart's automated takedown system—Plaintiffs have not submitted evidence that satisfactorily disputes this.  Because Plaintiffs are unable to show that

16

Wal-Mart failed to promptly remove infringing listings, the Court finds no dispute of material fact here.

### iii.    Section 512(c)(1)(A)(iii)

Plaintiffs argue that Wal-Mart fails to meet the threshold conditions for safe harbor immunity because Wal-Mart failed to reasonably implement its repeat infringer policies. ECF No. 121 at 5, 9-14. The Court disagrees.

Although the statute does not define "reasonably implemented," courts have found that an ISP implements a policy "if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007). Implementation of a repeat infringer policy "is not reasonable" if it is "not carried out in appropriate circumstances" by terminating users that repeatedly infringe. *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646, 2015 WL 1402049, at *12 (S.D.N.Y. Mar. 25, 2015). In general, though, "[c]ourts have recognized a wide range of procedures and practices for implementing a repeat infringer policy that constitute 'implementation'" and "there is a high bar for a plaintiff to show that a service provider, as a matter of law, does not 'implement' its repeat infringer policy within the meaning of the DMCA." *Id.* at *55; *see also Wolk*, 840 F. Supp. 2d at 744 (finding reasonable implementation where defendant had "a policy under which copyright holders can submit a take-down notice," posted it "on [its] website," and "remove[d] the infringing material" when appropriate); *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 637 (S.D.N.Y. 2011) (finding reasonable implementation where defendant had "a system for responding to takedown notices," did "not interfere with the

copyright owners' ability to issue notices," and "terminate[d] users who repeatedly or blatantly infringe[d]").

It is undisputed by the parties that Wal-Mart maintained a repeat infringer policy that allowed copyright holders to notify Wal-Mart of infringing listings and that this policy was made available to users on Walmart.com. ECF No. 121-3 ¶¶ 5-7. Plaintiffs, however, argue that Wal-Mart's policy was not reasonably implemented because it failed to consistently terminate infringing sellers—namely, JD. ECF No. 121 at 5. It is true that ISPs that "fail to terminate users despite their persistent and flagrant infringement are not eligible for protection under the safe harbor." *MP3tunes*, 821 F. Supp. 2d at 637 (S.D.N.Y. 2011). The Court is not convinced, however, that Wal-Mart made such a failure here.

First, as noted above, although the infringing listings were made via Joybuy, those listings were made by third-party sellers. It is therefore unclear to the Court whether the multiple infringements attributed to Joybuy were truly from the same infringing third-party sellers, or if each infringing listing was created by a new third-party seller that had, to this point, not been subjected to a takedown. Regardless, the bar for Plaintiffs to show lack of reasonable implementation is high. *Escape Media*, 2015 WL 1402049, at *55. And here, Snukset explains at length why Wal-Mart did not terminate JD or its marketplaces from Walmart.com: because Wal-Mart knew that JD was "not the actual source" of the infringing products and did not create the listings themselves, that JD had a relatively low number of infringement complaints relative to market volume, and a "lack of evidence of prior notice of Plaintiff's IP rights." ECF No. 109-3 ¶¶ 19-23. All of these constitute appropriate reasons why an ISP would refrain from terminating a user. *MP3tunes*, 821 F. Supp. 2d at 639 (holding that defendants reasonably implemented repeat infringer policy where it refrained from terminating user accounts, where the decision to not

terminate was made for "appropriate" reasons).  Plaintiffs may disagree with those reasons, but that disagreement is not grounds for disqualifying Wal-Mart from safe harbor immunity.  *See Rosen v. eBay, Inc.*, No. 13-CV-6801, 2015 WL 1600081, at \*8 (C.D. Cal. Jan. 16, 2015) ("[T]he implementation of a policy need not be perfect to render it sufficient to qualify a service provider for protection under § 512(c).").  The Court therefore finds that there is no genuine dispute of material fact as to Wal-Mart's implementation of its repeat infringer policy.[16]

## II.    Trademark Infringement

### a.  Direct Infringement

"Under section 32 [of the Lanham Act], the owner of a mark registered with the Patent and Trademark Office can bring a civil action against a person alleged to have used the mark without the owner's consent." *Tiffany*, 600 F.3d at 102 (internal quotation marks omitted).  To establish a of direct trademark infringement, a plaintiff must show "that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale[, offering for sale, distribution,] or advertising of goods or services, 15 U.S.C. § 1114(a)(1), (5), without the plaintiff's consent." *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005) (internal quotation marks omitted).

It is not clear to what extent Plaintiffs continue to assert direct trademark infringement claims against Defendants.  Plaintiffs' opposition to Wal-Mart's motion for summary judgment, for example, only refers to Wal-Mart being liable for *contributory* trademark infringement.  ECF No. 121 at 6.  Regardless, although Plaintiffs here argue that Defendants did not act with sufficient

---

[16] As to the contributory copyright infringement claims against Wal-Mart, because Wal-Mart is entitled to DMCA safe harbor immunity, these claims are necessarily also dismissed.  *See Wolk*, 840 F. Supp. 2d at 749 (granting summary judgment on contributory and vicarious copyright infringement claims because defendant was immune under the DMCA).

attention in taking down infringing products, they have submitted no evidence that Defendants themselves placed the infringing marks. *See Tiffany*, 600 F.3d at 103 ("E-Bay's knowledge *vel non* that counterfeit Tiffany wares were offered through its website is relevant to the issue of whether eBay contributed to the direct infringement of Tiffany's mark by the counterfeiting vendors themselves . . . [b]ut it is not a basis for a claim of direct trademark infringement against eBay."); *Car-Freshner Corp. v. Meta Platforms, Inc.*, No. 22-CV-1305, 2023 WL 7325109, at *20 (N.D.N.Y. Nov. 7, 2023) (finding no direct trademark infringement where, although plaintiffs claimed that defendant "did not promptly remove the infringing products from its websites," there was no indication that defendant itself infringed); *Lops v. YouTube, LLC*, No. 3:22-CV-843, 2023 WL 2349597, *3 (D. Conn. Mar. 3, 2023) (holding that defendant "cannot be subject to direct liability for trademark infringement based on videos uploaded by third parties"); *Nike, Inc. v. B&H Customs Servs., Inc.*, 565 F. Supp. 3d 498, 508 (S.D.N.Y. 2021) ("[T]he infringer must have some intention to sell, advertise, or distribute the infringing product or service in order for strict liability to attach. Mere unwitting transportation of another's goods is not enough . . ."). Accordingly, to the extent that Plaintiffs pursue direct trademark infringement claims against Defendants, the Court finds there is no genuine dispute of material fact.

### b. Contributory Infringement

As with its claims for direct infringement, Plaintiffs lack clarity as to what extent they bring contributory infringement claims against Defendants. Plaintiffs' opposition to Wal-Mart's motion for summary judgment argues briefly for Wal-Mart's contributory infringement liability, ECF No. 121 at 8, but Plaintiff's opposition to Defendants' joint summary judgment motion and Plaintiff's own motion for summary judgment do not, *see* ECF Nos. 111-2, 135. Whatever the case, the

Court finds that there is no genuine issue of material fact with respect to contributory trademark infringement.

"The Lanham Act does not expressly create liability for contributory trademark infringement, but the Supreme Court has concluded that 'liability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another.'" *Omega SA v. 375 Canal, LLC*, 984 F.3d 244, 254, n.11 (2d Cir. 2021) (quoting *Inwood Labs., Inc. v. Ives Labs.*, Inc., 456 U.S. 844, 853 (1982)). "[T]here are two ways in which a defendant may become contributorily liable for the infringing conduct of another: [(1)] if the service provider intentionally induces another to infringe a trademark, and [(2)] if the service provider continues to supply its [service] to one whom it knows or has reason to know is engaging in trademark infringement." *Tiffany*, 600 F.3d at 106 (internal quotation marks omitted). When concerning the alleged infringement of a service provider, the second prong requires that the service provider "have more than a general knowledge or reason to know that its service is being used to sell counterfeit goods. Some contemporary knowledge of [the infringing products] is necessary." *Id.* at 107. "[W]here a defendant knows or should know of infringement, whether that defendant may be liable for contributory infringement turns on what the defendant does next." *Omega*, 984 F.3d at 255. "If it undertakes bona fide efforts to root out infringement . . . that will support a verdict finding no liability, even if the defendant was not fully successful in stopping infringement. But if the defendant decides to take to or little action, it will support a verdict finding liability." *Id.*

The parties do not argue that Defendants intentionally induced infringements; the claims for contributory trademark infringement thus hinge on the second prong. ECF No. 121 at 8. The evidence shows that Defendants were on-notice that their marketplaces contained infringing listings—Plaintiff and their agents issued infringement complaints on dozens of such listings. ECF

No. 121-7 ¶ 13.  In response to these complaints, however, the evidence shows that Defendants promptly took down nearly all of the infringing listings.  ECF Nos. 67-3 ¶ 10, 109-3 at 14-21. Plaintiffs briefly argue that these were not "bona fide efforts to root out the infringement," but do not elaborate as to what more they believe Defendants should have done.  ECF No. 121 at 8.  Perhaps Plaintiffs mean that Wal-Mart should have terminated JD from further operations on Walmart.com, but doing so was not necessary to avoid liability.  *See, e.g., Atari Interactive, Inc. v. Redbubble, Inc.*, No. 21-17062, 2023 WL 4704891, at *1 (9th Cir. July 24, 2023) (affirming grant of summary judgment where the evidence showed that when plaintiff notified defendant of specific infringing listings, "[defendant] removed them" and "[a]s a large online marketplace, [defendant's] response was reasonable").  With no other arguments to weigh, the Court grants Defendants' motion for summary judgment as to contributory trademark infringement.[17]

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment on all claims (ECF Nos. 109, 123) are GRANTED.  Plaintiffs' motions for summary judgment on all claims (ECF No. 111) are DENIED.  Plaintiffs' motions for partial summary judgment (ECF No. 55), Defendants' motions for partial summary judgment (ECF No. 67), and Plaintiffs' motions to reopen the record (ECF No. 85) are DENIED AS MOOT.  The Clerk of Court is directed to enter judgment in favor of Defendants and close the cases.

IT IS SO ORDERED.

---

[17] As to Plaintiffs' remaining claims, "[c]ourts employ substantially similar standards when analyzing claims for trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a); false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); trademark infringement under New York common law; and unfair competition under New York common law. " *Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 301 (E.D.N.Y. 2014).  Accordingly, the Court grants Defendants' motions for summary judgment as to those claims as well.  *See Fantasia Distribution, Inc. v. Myle Vape, Inc.*, No. 20-CV-02378, 2024 WL 3966035, at *16 (E.D.N.Y. Aug. 28, 2024) (granting summary judgment on federal unfair competition and common law trademark and unfair competition claims because the court did the same for the federal trademark claim).

Dated:  March 31, 2025
        Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Court